UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DIANE B. O/B/O R.D.B.,[1]

                                                        Plaintiff,                Case # 19-CV-1383-FPG

v.                                                                              DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                                                        Defendant.
_____

## INTRODUCTION

Diane B. ("Plaintiff") brings this action on behalf of her grandson ("R.D.B.") pursuant to Title XVI of the Social Security Act. She seeks review of the final decision of the Commissioner of Social Security that denied R.D.B.'s Supplemental Security Income ("SSI") application. ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure Rule 12(c). ECF Nos. 6, 10. For the reasons that follow, the Commissioner's motion is DENIED, Plaintiff's motion is GRANTED, and this matter is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion.

## BACKGROUND

In January 2016, Plaintiff applied for SSI with the Social Security Administration on R.D.B.'s behalf. Tr.[2] 88. She alleged that R.D.B. had been disabled since March 2015 due to behavior issues, right-hand problems, eczema, and a heart condition. *Id.* On July 27, 2018, Plaintiff and R.D.B. appeared and testified at a hearing before Administrative Law Maria Herrero-

---

[1] Under this District's Standing Order, any non-government party must be referenced solely by first name and last initial.

[2] "Tr." refers to the administrative record in this matter. ECF No. 4.

1

Jaarsma ("the ALJ"). Tr. 47. On October 25, 2018, the ALJ issued a decision finding that R.D.B. is not disabled within the meaning of the Act. Tr. 15-32. On August 15, 2019, the Appeals Council denied Plaintiff's request for review. Tr. 1-3. This action seeks review of the Commissioner's final decision. ECF No. 1.

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citation omitted).

### II. Child Disability Standard

An individual under 18 years old will be considered disabled if he or she has a medically determinable physical or mental impairment that results in marked and severe functional limitations that can be expected to result in death or that has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner must follow a three-step process to evaluate child disability claims. *See* 20 C.F.R. § 416.924. At step one, the ALJ determines whether the child is engaged in substantial gainful work activity. *Id.* § 416.924(b). If so, the child is not disabled. If not, the ALJ proceeds

to step two and determines whether the child has an impairment or combination of impairments that is "severe," meaning that it causes "more than minimal functional limitations." *Id.* § 416.924(c). If the child does not have a severe impairment or combination of impairments, he or she is not disabled. If the child does, the ALJ continues to step three.

At step three, the ALJ examines whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 416.924(d). If the child's impairment meets or medically or functionally equals the criteria of the Listings, he or she is disabled.

To determine whether an impairment or combination of impairments functionally equals the Listings, the ALJ assesses the child's functioning in six domains: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal the Listings, the child's impairment(s) must cause "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(a). A child has a marked limitation in a domain when his or her impairment(s) "interferes seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2). A child has an extreme limitation in a domain when his or her impairment(s) "interferes very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3).

**DISCUSSION**

**I.    The ALJ's Decision**

The ALJ analyzed R.D.B.'s benefits application under the process described above. At step one, the ALJ found that R.D.B. has not engaged in substantial gainful activity. Tr. 18. At step two, the ALJ found that R.D.B. has attention deficit and hyperactivity disorder ("ADHD") and behavioral issues, including oppositional defiance disorder ("ODD"). *Id.* At step three, the ALJ found that these impairments, alone or in combination, do not meet or medically equal a Listings impairment. Tr. 19. Next, the ALJ found that R.D.B.'s impairments, alone or in combination, do not functionally equal a Listings impairment. Tr. 20-32. She concluded that R.D.B. had a "less than marked" limitation in every domain, except for the domain of "Moving About and Manipulating Objects," in which R.D.B. had "no limitation." Tr. 25-32.

**II.   Analysis**

Although the parties do not frame their disputes on appeal in precisely this manner, it is evident from the briefing that there is a fundamental disagreement as to whether R.D.B.'s ODD, aggression, and general behavioral problems improved or worsened over time. *See* ECF No. 6-1 at 14-15; ECF No. 10-1 at 12. The Commissioner defends the ALJ's conclusion that R.D.B's behavior improved, while Plaintiff argues that R.D.B.'s behavior deteriorated. After reviewing the record and the parties' arguments, the Court concludes that the ALJ's analysis on this issue was erroneous and requires further development of the record. Remand is therefore warranted.

R.D.B. was born in June 2013. Tr. 18, 88. Plaintiff—R.D.B.'s paternal grandmother—has long acted as R.D.B.'s guardian, as neither of R.D.B.'s parents were in his life. *See* Tr. 55, 182, 346. From a young age, R.D.B. struggled with behavioral problems. Evaluations regularly indicated that R.D.B. engaged in aggressive behaviors in response to requests or when he became

4

frustrated. *See, e.g.*, Tr. 187, 715, 718, 722. He would throw objects, scream, and refuse to act. Tr. 715, 718. Plaintiff noted to one evaluator that R.D.B. could be "very aggressive with other children and play rough." Tr. 722.

Plaintiff believes there is a link between Plaintiff's behavioral problems and interactions with his mother. *See* Tr. 54-55, 59, 722. This became especially noticeable in September 2017—when R.D.B. was four years old. At that time, R.D.B.'s mother re-entered his life and began having regular visitation with him. *See* Tr. 22, 55. At the hearing, Plaintiff testified that she noticed a change in R.D.B.'s behavior. Although he had been "doing very well as far as behavior" and had "progressed a lot," she noticed that once his mother returned his behavior "diminished" and he became "very aggressive." Tr. 54-55. In the aftermath of a visit with his mother, R.D.B. would "wake up crying," get "jealous" when he saw other children with their parents, and become "aggressive and angry" with his peers. Tr. 59. R.D.B. began receiving more timeouts at school, failed to listen to his teachers, and could not stay on task. Tr. 74. Plaintiff testified that when R.D.B. gets overstimulated he can become agitated and "can't stop." Tr. 78. He has emptied out Plaintiff's purse onto the floor, cut up objects with scissors, and broke an iPad. Tr. 69, 78, 79. He hits his head against the wall, hits others, and draws pictures of guns. Tr. 57.

Records from a variety of sources corroborate that R.D.B.'s behavioral problems worsened after September 2017. In an April 2018 regression chart, it is noted that R.D.B. has difficulty maintaining self-control, often leaves the area of instruction, and acts in an unsafe manner. Tr. 705. School counselor Carol Meyer noted that R.D.B. had made limited academic progress, had difficulty following classroom rules, became aggressive with peers and adults, exhibited difficulty tolerating the classroom environment, and had "constant self-directed, impulsive, and negative-attention seeking behaviors." Tr. 706.

In R.D.B.'s April 2018 Individualized Education Program ("IEP"), it is noted that R.D.B. is a friendly student who can become aggressive when overstimulated. Tr. 680. The IEP did not recommend a behavioral intervention plan but indicated that R.D.B. needed "strategies" and supports "to address behaviors that impede [his] learning or that of others." Tr. 682.

At a May 2018 classroom observation, school psychologist Valerie Knoll, Ph.D., observed R.D.B. whine, cry, and pound his hands on the table with frustration during an arts-and-crafts activity. Tr. 700. Dr. Knoll also noted R.D.B.'s teacher's report that R.D.B. was "a good student who has behavioral concerns at times." *Id.* Although he can appropriately engage with peers, when he "becomes upset it is difficult to redirect and calm him down." *Id.* Dr. Knoll indicated that during her own testing, R.D.B. was "friendly and energetic" but needed frequent prompting to stay on task. Tr. 701.

At a May 2018 therapy appointment, mental health counselor Angela Docenko noted during R.D.B.'s mental status examination that he "becomes defiant, hits and tantrums when not getting his way." Tr. 668.

Because of R.D.B.'s behavioral changes and ongoing attention issues, his primary care physician prescribed him with an ADHD medication in spring 2018. Tr. 55. The hope was that the medication would allow R.D.B. to "stay more attentive" and not "be so aggressive." *Id.* The doctor informed Plaintiff that she would not immediately notice any behavioral changes, but "as the months go along," she would. *Id.* It appears that compliance with medication was initially impeded by R.D.B.'s mother, who told him not to take it. Tr. 66. Even with compliance, Plaintiff noticed that R.D.B.'s behavioral problems have continued. *See* Tr. 66-68; Tr. 80. One of R.D.B.'s teachers remarked in May 2018, however, that R.D.B. was "much calmer in school since starting" his new medication. Tr. 700.

6

In her decision, the ALJ found that R.D.B. "notably regressed after [his] mother re-entered his life for regular visitation."  Tr. 22; *see also* Tr. 28 (noting that R.D.B.'s "aggression has returned once his mother re-entered his life").  Nevertheless, the ALJ did not conclude that this regression impaired R.D.B.'s functional abilities to a significant degree.  From what the Court can glean from the decision, the ALJ arrived at this conclusion because (1) some record evidence suggested a milder degree of behavioral problems than what Plaintiff alleged; and (2) R.D.B.'s ADHD medication improved his behaviors.

It is apparent that the ALJ "selectively parsed" the record to reaching these findings, however.  *Trumpower v. Colvin*, No. 13-CV-6661, 2015 WL 162991, at *16 (W.D.N.Y. Jan. 13, 2015) (noting that an ALJ may not "cherry-pick[] evidence from the record").  When read in context, the evidence is not as favorable as the ALJ suggests.  For example, the ALJ states that Plaintiff reported an improvement in R.D.B.'s symptoms with medication, Tr. 22, 23, 27, but Plaintiff specifically testified that R.D.B.'s behavioral problems had *not* improved with medication.  *See* Tr. 68 (agreeing that, because of the behavioral issues, R.D.B. was "still having problems paying attention [and] completing tasks"); Tr. 80 (affirming that, even with treatment, the "behavior is still a problem").  The ALJ notes that R.D.B.'s teacher found him "much calmer" with medication, but ignores the teacher's comments that he still "has a very hard time with being distracted and disrupting instruction," chooses not to follow classroom rules at times, and once upset has difficulty calming down and redirecting.  Tr. 700.  The ALJ noted that Plaintiff's IEP did not contain a behavioral intervention plan, Tr. 23, but omitted the recommendation that he needed strategies and supports to address his behavioral problems.  Tr. 682.  The ALJ favorably cited the fact that R.D.B. has made a friend and plays with neighborhood children, Tr. 28, but she did not articulate how R.D.B.'s abilities in that narrow, unstructured setting somehow cast doubt

7

on the consistent evidence that R.D.B. has significant difficulty obeying rules, managing his emotions, and limiting his aggressive behaviors in other settings like school. While an ALJ is free to resolve conflicts in the record, she may not take evidence out of context in a selective manner. *See Wilson o/b/o B.D.W. v. Comm'r of Soc. Sec.*, No. 19-CV-749, 2020 WL 4745200, at *4 (W.D.N.Y. Aug. 17, 2020).

The ALJ's selective reading of the record infected her entire analysis. She gave great weight to the opinion of state-agency psychologist C. Nohejl, M.D., Tr. 23, despite the fact that Dr. Nohejl issued the opinion in July 2016—more than one year before R.D.B.'s regressive behavioral problems. Tr. 94; *see also Best v. Berryhill*, No. 17-CV-795, 2019 WL 1146341, at *2 (W.D.N.Y. Mar. 13, 2019) ("[A] medical opinion may be stale if subsequent treatment notes indicate a claimant's condition has deteriorated."). Based on the premise that R.D.B. did not continue to have serious behavioral problems, the ALJ then found less-than-marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others. Tr. 26-28. As discussed above, the evidence the ALJ cited does not support that premise, and the record suggests that greater limitations may be warranted. *See* SSR 09-3p, 2009 WL 396025, at *2 (Feb. 17, 2009) (noting that a mental disorder may interfere with a child's ability to acquire and use information if it renders the child unable to "perform learning-related tasks at school"); 20 C.F.R. § 416.926a(h)(3) (child may have limited functioning in "Attending and Completing Tasks" if he is "easily frustrated and give[s] up on tasks" or "require[s] extra supervision to keep [him] engaged in an activity"); 20 C.F.R. § 416.926a(i), (i)(2)(iii) (stating that domain of "Interacting and Relating with Others" in part pertains to child's ability to "comply with rules" and that a preschooler should be able to "use words instead of actions to express [himself]").

This is not to say that the record compels the opposite conclusion—that R.D.B. was markedly limited in any domain. Rather, the issue is that there was essentially a gap in the record. The ALJ recognized that R.D.B.'s behavioral problems had morphed and worsened during the 2017-2018 school year. In spring 2018, R.D.B.'s treating physician prescribed him new medication in hopes that it would help. *See* Tr. 55. But the medication would take a few months to have an effect, *see id.*, and, unfortunately, there are no records after spring 2018 that shed light on the efficacy of R.D.B.'s medication. The most recent information in the record is Plaintiff's hearing testimony from July 2018. Tr. 47. There are no school, counseling, or other records that give insight into whether the medication helped R.D.B. better navigate school and his interactions with family, peers, and adults. Furthermore, the ALJ had no competent medical opinion before her that addresses the interaction between R.D.B.'s use of ADHD medication and his behavioral problems.[3]

In the absence of such records or competent medical opinion, the ALJ attempted to assemble what evidence she could to make a decision. But, given the gaps in the record, the ALJ should have sought out more information. "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted). "This duty includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled."

---

[3] There were a number of opinions in the record from various therapists and counselors. *See* Tr. 23-24 (summarizing opinion evidence). But only one opinion postdates R.D.B.'s regression—that of Dr. Knoll—and her evaluation primarily concerned intellectual testing. *See* Tr. 700-02. The ALJ purported to give "significant weight" to Dr. Knoll's testing results, but omitted any discussion of her observations of R.D.B.'s behavioral problems. Tr. 23, 700-01.

*Torres v. Colvin*, No. 13-CV-341, 2015 WL 1735092, at *8 (W.D.N.Y. Apr. 16, 2015) (internal quotation marks omitted). Furthermore, an ALJ is obliged to "develop the record by obtaining a medical opinion" where the record contains no competent medical opinion regarding a claimant's functional abilities. *Truby v. Comm'r of Soc. Sec.*, No. 18-CV-6069, 2019 WL 2295403, at *4 (W.D.N.Y. May 30, 2019); *see also Vozzella v. Berryhill*, No. 18-CV-356, 2019 WL 1324951, at *3 (D. Conn. Mar. 25, 2019) ("[T]he absence of any medical source opinion as to the plaintiff's limitations left a gap in the record, triggering the ALJ's duty to further develop the record."). The efficacy of the ADHD medication was a critical issue that required further development.

In light of the above-described errors in the ALJ's analysis, remand for further development of the record and proceedings is warranted.

## CONCLUSION

The Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is DENIED and Plaintiff's Motion for Judgment on the Pleadings (ECF No. 6) is GRANTED. This matter is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: March 16, 2021
      Rochester, New York

                              HON. FRANK P. GERACI, JR.
                              Chief Judge
                              United States District Court